**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Billie Shups POLLARD et al.,
Defendants-Appellants.**

**Nos. 71-1754 to 71-1758.**

United States Court of Appeals,
Tenth Circuit.

Aug. 28, 1972.

E. Edward Johnson, Asst. U. S. Atty. (Robert J. Roth, U. S. Atty., on the brief), for plaintiff-appellee.

Robert M. Brown, Topeka, Kan., for defendants-appellants.

Before BREITENSTEIN, SETH and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

Billie Shups Pollard, Thomas Wooldridge, Jewell Pickett, George Spears, and Sandy Pettyjohn were arrested on December 12, 1968, in connection with the attempted burglary of the Silver Lake State Bank of Silver Lake, Kansas. Silver Lake is located some ten miles west of Topeka, Kansas, and has a population of 392.

On April 2, 1969, the five were charged by indictment with conspiring to burglarize the Silver Lake State Bank, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and in a second count they were charged with an unlawful attempt to enter that bank. 18 U.S.C. § 371, 18 U.S.C. § 2113(a), 18 U.S.C. § 2. Upon trial some two years later all five were convicted on both counts, and each now appeals.

In our view, the central issue is whether the search of Pollard's 1969 Buick and the seizure therefrom of certain burglary tools was lawful. We conclude that it was. To give meaning to this conclusion, the facts must be developed in some detail.

F.B.I. agents, for reasons which they deemed good and sufficient, set up a surveillance of Pollard in Indianapolis, Indiana, on December 5, 1968, and daily thereafter followed his movements in that city up to December 10, 1968. There was testimony that Pollard was observed making contact with George Spears, one of the defendants. Additionally, at one point during the surveillance, Pollard was observed to have in his possession certain burglary tools, namely, five pieces of pipe approximately five feet long which were said to resemble "burning bars." An F.B.I. agent described a "burning bar" and its operation as follows:

"This piece of pipe in turn is threaded on one end, or it could be on both ends, but just for sake of description it is threaded on one end. This thread is connected to a hose. The hose—rubber hose is directly connected to an oxygen tank. The only source of supply to a burning bar then is just plain oxygen. The bar has to be ignited by an acetylene type torch. It requires a high temperature of heat to ignite this burning bar. Once the burning bar catches fire at the end, the heat of the burning bar is controlled by the amount of pressure—of oxygen pressure going through the line. The pipe burns itself up as it is destroying everything that it comes in contact with. There isn't—I have been on demonstrations and given talks with the head metallurgist and engineers from Wright Patterson Air Force Base in Ohio bring in these exotic metals, titanium, titinium alloys and some of supposed to be the strongest metals known to man now, you know, artificial type metals. But, it could cut through that. It would take maybe a split second longer than would be a normal piece of metal. There isn't anything it won't burn through. The temperature is in excess of 10,000 degrees."

On December 10, 1968, Pollard left Indianapolis, Indiana, in a 1969 Buick, with the F.B.I. thereafter continuing their surveillance of Pollard across the states of Illinois and Missouri on into Topeka, Kansas, where Pollard checked into the Holiday Inn North in the early morning hours of December 11, 1968. Thereafter, on the same day, Wooldridge and Pickett, driving a 1965 Oldsmobile

bearing Kentucky license plates, checked into another room of the Holiday Inn North, having driven to Topeka from Kentucky. Later that same day, Spears and Pettyjohn, who had traveled from Indianapolis to Topeka, were observed at the Inn, parking their 1965 Plymouth in front of Pollard's room.

F.B.I. agents testified in minute detail as to the activities of each of the five during the afternoon and evening of December 11, 1968, and the early morning hours of December 12, 1968. For example, it was established that at about 4:00 P.M. on December 11, Pollard and Wooldridge in the 1969 Buick drove to the town of Silver Lake, Kansas, and the net effect of this particular testimony was that the two were "casing" the Silver Lake State Bank. Additionally, at about 9:00 P.M. on December 11, Pollard, Wooldridge and Spears were observed to drive in the 1965 Plymouth to the vicinity of the Knoll Welding Supply Company in Topeka, where they circled the plant several times at slow speed and then stopped for a short period of time. In this connection, the proprietor of that company testified that on the night in question a 122-cubic foot oxygen cylinder disappeared.

Shortly after midnight on December 12, the five drove from the Inn in the 1965 Oldsmobile into Silver Lake near the general vicinity of the Silver Lake State Bank. Just prior to leaving, Pollard was seen to be carrying a bag in each hand, one being a long slender bag, "similar to the type that you might carry a rifle in * * * long and slender." The Oldsmobile sometime later returned to the Inn but with only two occupants. Shortly thereafter these two persons, identified as "two females," entered the Plymouth and headed back towards Silver Lake.

Sometime before 3:00 A.M. on December 12, 1968, an attempt was made to enter the Silver Lake State Bank by the back door, the screen having been cut and the door itself bearing evidence that a forceful entry had been attempted.

Several F.B.I. agents were at the time in the immediate vicinity of the bank. One agent testified that he literally ran into Pollard trotting along some railroad tracks near the bank, this agent identifying Pollard and testifying that at the time Pollard was carrying a walkie-talkie radio. This same agent also testified that he then climbed on top of a boxcar and while observing from that vantage point saw two persons, other than Pollard, talking and looking in the direction of the bank. Another agent testified that he saw an unidentified figure coming from the rear of the bank carrying a bag with a handle on it, the bag being about three feet long.

Shortly before 4:00 A.M. on December 12, 1968, all five appellants returned to the Inn in the 1965 Plymouth. Spears and Pettyjohn very shortly thereafter left the Inn and were arrested a short distance away. Moments later, Wooldridge and Pickett were arrested in their room in the Inn and Pollard was then arrested in his room. After being advised of his constitutional rights, Pollard declined to talk. Thereupon, the agents proceeded to first search his room and thereafter his 1969 Buick parked immediately outside his motel room. In the trunk of the Buick the agents found and seized, among other things, the following items: A canvas zippered bag; work-type gloves; welder's mask; three ski masks; 100 feet of plastic garden-type hose; two pair of black leather gloves; pry bar; hatchet; Allen wrench; dust respirators; hammers; crescent wrenches; screwdriver; vice grips; two acetylene tanks; oxygen tank; air gauges with hose attached; five burning bars; flashlight; two two-way radios; pipe wrenches; cutting tips for a torch; and one cutting torch.

Before considering the validity of the search of Pollard's Buick, brief reference will first be made to certain related matters. One ground urged for reversal is the alleged insufficiency of the evidence. It is said that the evidence presented by the Government, at the best, creates only a suspicion that the

defendants conspired to commit a bank burglary and thereafter attempted to do so, and falls short of proof beyond a reasonable doubt. We disagree.

By our summary of the evidence, we did not mean to convey the impression that every F.B.I. agent involved in the surveillance identified all the defendants by name. They did not. Nevertheless, the impact of the totality of their testimony, which dovetailed in countless particulars, is that these five defendants came to Topeka, Kansas, from out of state and conspired to burglarize the Silver Lake State Bank. Additionally, the evidence, much of it admittedly circumstantial in nature, is sufficient to permit the inference that the five drove to Silver Lake in the early morning hours of December 12, 1968, at an hour when nobody else was on the streets of Silver Lake, excepting F.B.I. agents, and three of their number attempted to gain entry into the Silver Lake State Bank. As indicated, Pollard was definitely identified as being near the Silver Lake State Bank with a walkie-talkie at about the time two other unidentified persons were observed in the general area. Additionally, there was testimony that one person during the course of the evening's activities was observed coming from the rear of the bank carrying an odd-shaped bag about three feet long. Without further comment, our study of the record convinces us that there is sufficient evidence to support the convictions of each of the five.

■ Continuing, then, the facts and circumstances within the knowledge of the F.B.I. agents gave them ample reason to arrest Pollard in his motel room. In other words, the arresting agents had probable cause to believe that there had been an attempt to burglarize the Silver Lake State Bank and that Pollard was involved in the attempt. And the search of the motel room under the circumstances was incident to a lawful arrest.

■ However, the fact that the agents had probable cause to arrest Pollard does not in itself justify a warrantless search of his vehicle, since the search of the car, as opposed to the search of the motel room, cannot be justified as an incident to an arrest. Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). However, as in *Chambers*, the facts of the instant case giving rise to probable cause to arrest just as obviously give rise to probable cause to search. Also, the circumstances present in the instant case are as "exigent" as those present in *Chambers*, rendering an immediate warantless search constitutionally permissible. Being of the view that the rationale of *Chambers* renders valid the search of Pollard's Buick, further reference thereto is deemed helpful.

In *Chambers*, two men robbed a service station operator and fled the scene in a station wagon. About an hour later, a station wagon answering the description of the get-a-way vehicle was stopped and the occupants, who answered the description of the two robbers, were arrested and the vehicle was driven to the police station. There, without the benefit of a search warrant, the station wagon was thoroughly searched, and certain fruits of the robbery were recovered, as well as the revolvers used in the perpetration of the robbery. Under such circumstances, it was held that not only would an immediate on-the-spot search have been constitutionally permissible, but that the subsequent warrantless search at the station was equally valid. In thus holding, the Supreme Court made the following pertinent comment:

" * * * For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

"On the facts before us, the blue station wagon could have been searched on the spot when it was

stopped since there was probable cause to search and it was a fleeting target for a search. The probable-cause factor still obtained at the station house and so did the mobility of the car unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is secured. In that event there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained. * * *"

In our view, the recent case of Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), does not dictate a different result. In Coolidge, as in Chambers, the search was conducted at the station house sometime after the owner or occupant, as the case may be, had been arrested. In Chambers, as indicated, the Supreme Court held that an immediate search contemporaneous with the arrest would have been constitutionally permissible, there being not only probable cause to thus search, but there also being present "exigent circumstances." In Coolidge, however, though there was probable cause to make an immediate search, it was held that there were no such "exigent circumstances," as existed in Chambers, to the end that a warrantless on-the-spot search was impermissible. In this connection, it is noted that in Coolidge the person arrested was apparently a long-time resident of the city, whose car was openly parked in the driveway of his home. Here, Pollard was a transient, of sorts, hundreds of miles from his home, with his vehicle parked just outside his motel room and readily available for a quick departure. Two of the five defendants, Spears and Pettyjohn, were arrested as they were leaving the Inn at about four o'clock in the morning. How long Pollard himself would remain at the Inn was uncertain. Without going into further detail, Pollard's Buick was, in our view, a "fleeting target" of the type alluded to in Chambers and the instant case presents exigent circumstances not present in Coolidge. Accordingly, it is on this basis that we find the search of Pollard's Buick to be a lawful one.

Some two years after the return of the indictment, Pollard, but not the other defendants, moved to dismiss on the ground that he had been denied his constitutional right to a speedy trial. This motion was denied and thereafter the matter came on for trial in about six weeks. We note that during the interim between indictment and trial, Pollard had been incarcerated as the result of another conviction. Also, the defendants filed a number of motions, some of which involved evidentiary hearings and the motion to suppress was then held under advisement by the trial court for a considerable length of time. Be all that as it may, the contention that the trial court erred in denying Pollard's motion to dismiss is in our view fully answered by the recent case of Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), announced June 22, 1972. In Barker, trial occurred some five years after the arrest. In holding that Barker was not deprived of his due process right to a speedy trial, the Supreme Court adopted a "balancing test" with the following comment:

"We, therefore, reject both of the inflexible approaches—the fixed time period because it goes further than the Constitution requires; the demand-waiver rule because it is insensitive to a right which we have deemed fundamental. The approach we accept is a balancing test, in which the conduct of both the prosecution and the defendant are weighed.

"IV.

"A balancing test necessarily compels courts to approach speedy-trial cases on an ad hoc basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify

four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."

Applying the rule of *Barker*, we find no error on the part of the trial court in denying Pollard's motion to dismiss.

The other matters raised in this court, namely, (1) the alleged lack of competent evidence that the Silver Lake State Bank was federally insured; (2) the refusal of the trial court to require a "yes or no" answer from a witness; (3) permitting a witness to use his statement to the F.B.I. in connection with his testimony; (4) the giving of verbal rather than written instructions to the jury, and the alleged inadequacy of the instruction on reasonable doubt and circumstantial evidence; and (5) the overruling of motions for separate trials, have been considered and are without merit. Comment thereon is unnecessary.

Judgments affirmed.