**UNITED STATES of America, Appellee,**

v.

**Randy Lynn TERRY, Appellant.**

**No. 04–2595.**

United States Court of Appeals, Eighth Circuit.

Submitted: Dec. 14, 2004.

Filed: March 7, 2005.

---

Gary G. Colbath, argued, Rapid City, SD (Monica D. Thomas, Rapid City on the brief), for appellant.

Jeffrey C. Clapper, Asst. U.S. Attorney, argued, Sioux Falls, SD, for appellee.

Before MORRIS SHEPPARD ARNOLD, BEAM, and RILEY, Circuit Judges.

MORRIS SHEPARD ARNOLD, Circuit Judge.

Randy Terry entered a conditional plea of guilty to possessing a firearm after previously being convicted of a misdemeanor crime of domestic violence, a violation of 18 U.S.C. § 922(g)(9). He did so after the district court[1] denied his motion to suppress a firearm and ammunition seized from his vehicle and statements that he

---

1. The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota.

made the day following his seizure. On appeal, he argues that the district court erred in denying his motion to suppress. We affirm.

Mr. Terry, who is not an Indian, argues that tribal police officers acted in excess of their authority by seizing him and violated the Constitution when they searched his vehicle. We hold that the tribal officers acted within the scope of their authority and that the search complied with the requirements of the fourth amendment. Mr. Terry also maintains that the district court erred in denying his motion to suppress statements that he made the day after his seizure. He asserts that these statements were the fruit of the improper seizure and of a question asked of him the previous evening without the benefit of *Miranda* warnings. We conclude that the statements made after Mr. Terry received *Miranda* warnings are admissible because he knowingly and voluntarily waived his *Miranda* rights, and his earlier unwarned statement did not result from coercion or a calculated effort to undermine his will.

## I.

Sergeant Jackson Ten Fingers, of the Oglala Sioux Tribe Department of Public Safety, received a call late one night to go to the Robert Bettelyoun residence to investigate a domestic violence complaint that Mr. Terry's wife, Lynn Bettelyoun, had made against her husband. The dispatcher informed Sergeant Ten Fingers that Mr. Terry was in an older, yellow pickup truck and that Ms. Bettelyoun had obtained a protection order against Mr. Terry in North Platte, Nebraska. Sergeant Ten Fingers met Tribal Officers Steve Hawk and Dan Crazy Thunder and passed on information about the call that he had received to them. They then proceeded to the Bettelyoun residence with Sergeant Ten Fingers in one vehicle and Officers Hawk and Crazy Thunder in another.

Upon arriving at the Bettelyoun residence, located near Oglala, South Dakota, on the Pine Ridge Indian Reservation, the tribal officers observed a yellow pickup truck. Sergeant Ten Fingers approached the pickup and asked the occupant to exit the vehicle. When the occupant did so, Sergeant Ten Fingers smelled alcohol on his breath. Sergeant Ten Fingers then handcuffed him and placed him in the back seat of his patrol car. The officers identified the suspect as Randy Terry. At that time, the officers did not know if Mr. Terry was an Indian: Their common practice was to detain a suspect first and then determine race, and they followed that practice in the instant case.

Either before or after Mr. Terry exited his truck, Officer Hawk observed a box of Remington ammunition on the truck's dashboard. Officer Hawk then searched the vehicle, finding a rifle and a pack of beer behind the seat. Sergeant Ten Fingers was inside the Bettelyoun residence speaking with Ms. Bettelyoun at the time. Sergeant Ten Fingers testified at the hearing on the suppression motion that when he returned from speaking with Ms. Bettelyoun, he advised Mr. Terry that "he was under arrest" for domestic violence "and was going to be detained for the Shannon County Sheriff." Sergeant Ten Fingers further testified that he later "arrest[ed]" Mr. Terry "to be detained for the Shannon County Sheriff" for driving while intoxicated, spouse abuse, liquor violation, and disorderly conduct, all tribal ordinance violations.

Mr. Terry agreed to have tribal officers drive his vehicle to the tribal jail rather than having it towed. As he drove the pickup, it occurred to Sergeant Ten Fingers that Mr. Terry was probably not an Indian because it would be unlikely that an

Indian from Pine Ridge would be subject to a Nebraska protection order. Sergeant Ten Fingers therefore called James Daggett, the sheriff of Shannon County, South Dakota, to advise him that he might be holding a non-Indian. At the time, the sheriff was at home in Hermosa, South Dakota, approximately eighty miles from the Pine Ridge Reservation. Sheriff Daggett asked Sergeant Ten Fingers to hold Mr. Terry overnight until he could pick him up the next morning. It was not unusual for Sheriff Daggett to ask the tribal police to hold a suspect for up to eight hours because, at the time, he had only one patrol car and a single part-time deputy.

When Mr. Terry arrived at the Pine Ridge tribal jail, Bureau of Indian Affairs Special Agent Fred Bennett, without giving a *Miranda* warning, asked him if he had been previously convicted of domestic violence. (Agent Bennett had already reviewed a printout that listed the defendant's prior charges but omitted the dispositions for some of them.) Mr. Terry responded affirmatively and stated that the domestic violence conviction was in 1999. Although Mr. Terry seemed eager to talk, Agent Bennett refused to continue the conversation because the defendant appeared intoxicated. The following day, Agent Bennett interviewed Mr. Terry at the Pine Ridge tribal jail. Mr. Terry was informed of and chose to waive his *Miranda* rights and spoke with Agent Bennett about the previous night's events. Sheriff Daggett took custody of Mr. Terry later that day.

## II.

■ When reviewing a denial of a motion to suppress, we examine the factual findings underlying the district court's conclusion for clear error and review *de novo* the ultimate question of whether the fourth amendment has been violated. *United States v. White*, 356 F.3d 865, 868 (8th Cir.2004). The fourth amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991).

■ Mr. Terry contends first that the tribal officers were not reasonable in believing that they had authority to seize him in the manner that they did. Mr. Terry correctly asserts that he is not subject to the criminal jurisdiction of the Oglala Tribe because he is not an Indian. *See Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 195, 212, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978). But tribal police officers do not lack authority to detain non-Indians whose conduct disturbs the public order on their reservation.

■ The Supreme Court has recognized that tribal law enforcement authorities possess "traditional and undisputed power to exclude persons whom they deem to be undesirable from tribal lands," and therefore have "the power to restrain those who disturb public order on the reservation, and if necessary to eject them." *Duro v. Reina*, 495 U.S. 676, 696–97, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990). "Where jurisdiction to try and punish an offender rests outside the tribe, tribal officers may exercise their power to detain the offender and transport him to the proper authorities." *Id.* at 697, 110 S.Ct. 2053; *see also Strate v. A–1 Contractors*, 520 U.S. 438, 456 n. 11, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997). Because the power of tribal authorities to exclude non-Indian law violators from the reservation would be meaningless if tribal police were not empowered to investigate such violations, tribal police

must have such power. *See Ortiz–Barraza v. United States,* 512 F.2d 1176, 1180 (9th Cir.1975). When exercising this power, however, tribal officers must avoid effecting a constitutionally unreasonable search or seizure. *See* 25 U.S.C. § 1302(2).

■ We conclude that the Oglala tribal officers' detention of Mr. Terry falls within the rule of *Duro.* Sergeant Ten Fingers alerted Sheriff Daggett after it occurred to him that Mr. Terry was probably not an Indian and approximately a half-hour after receiving the initial call regarding the disturbance at the Bettelyoun residence. Although Sergeant Ten Fingers testified that he "arrested". Mr. Terry "to be detained for the Shannon County Sheriff" on a number of tribal charges, we do not think that the record indicates that tribal officers ever required or even intended to require Mr. Terry to submit to the criminal jurisdiction of the Oglala Tribe. *Cf. Oliphant,* 435 U.S. at 195, 212, 98 S.Ct. 1011. They held Mr. Terry pursuant to the express instructions and authority of Sheriff Daggett. Furthermore, we cannot say that the tribal officers held Mr. Terry for an unreasonable amount of time in the circumstances, since Sheriff Daggett was eighty miles away on a rainy night and his only deputy was unavailable.

■ Having concluded that the tribal officers had authority to seize Mr. Terry, we now turn to his argument that the tribal officers acted unreasonably in searching his vehicle. At the time that the tribal officers stopped Mr. Terry they clearly had a reasonable and articulable suspicion that "criminal activity may be afoot." *See Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). They were responding to a 911 call reporting that a man in a yellow pickup was causing a disturbance and attempting to enter the Bettelyoun residence, and upon arriving at that residence they observed the defendant in a yellow pickup on the Bettelyouns' property. After approaching him, Sergeant Ten Fingers smelled alcohol on Mr. Terry's breath. These circumstances provided an adequate basis for the officers to suspect that criminal activity was afoot.

■■ As we have said, at some point in the course of the encounter Officer Hawk observed a box of Remington ammunition on the dashboard of Mr. Terry's vehicle. He recognized what it was by the distinctive green and yellow markings on the box. The district court held that Officer Hawk properly seized the ammunition pursuant to the plain-view doctrine. For evidence to be legally seized pursuant to the plain-view doctrine, the officer must not have violated the fourth amendment to be in the place where the evidence could be plainly viewed, the incriminating nature of the evidence must have been immediately apparent, and the officer must have had "a lawful right of access to the object." *Horton v. California,* 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). On appeal, Mr. Terry argues only that the district court erred in concluding that the second requirement was satisfied.

The defendant argues that the incriminating nature of the ammunition could not have been immediately apparent to Officer Hawk because the officer did not know of the protection order at the time that he noticed the ammunition. (A person subject to a protection order is generally prohibited from possessing firearms or ammunition. *See* 18 U.S.C. 922(g)(8).) The district court found, however, that Officer Hawk knew of the protection order at the time he saw the ammunition, and that finding is not entirely without foundation in the record.

■ But even if Officer Hawk had no personal knowledge of the protection order at the time he observed the ammunition, we conclude that there was no constitutional violation here. Where officers work together on an investigation, we have used the so-called "collective knowledge" theory to impute the knowledge of one officer to others. *United States v. Gillette*, 245 F.3d 1032, 1034 (8th Cir.2001), *cert. denied*, 534 U.S. 982, 122 S.Ct. 415, 151 L.Ed.2d 316 (2001). We impute information· if there has been "some degree of communication" between the officers. *United States v. Gonzales*, 220 F.3d 922, 925 (8th Cir.2000). This requirement distinguishes officers functioning as a team from officers acting as independent actors who merely happen to be investigating the same subject. *See Gillette*, 245 F.3d at 1034. In the instant case, Sergeant Ten Fingers met and communicated with Officers Hawk and Crazy Thunder before proceeding as a team onto the Bettelyoun property, providing the requisite coordination and communication to impute Sergeant Ten Fingers's knowledge of the protection order to Officer Hawk.

■ The legal discovery of the contraband ammunition in Mr. Terry's ·vehicle sufficed to create probable cause for Officer Hawk to believe that other parts of the vehicle contained additional contraband or evidence. *See United States v. Fladten*, 230 F.3d 1083, 1086 (8th Cir.2000) (per curiam). Thus, his warrantless search of the vehicle was proper under the so-called "automobile exception" to the warrant requirement. *See United States v. Rowland*, 341 F.3d 774, 784–85 (8th Cir.2003), *cert. denied*, 540 U.S. 1093, 124 S.Ct. 969, 157 L.Ed.2d 802 (2003). Accordingly, there is no basis for suppressing the firearm that Officer Hawk uncovered as a result of that search.

Mr. Terry also challenges the district court's conclusion that statements that he made to Agent Bennett during the second interview should not be suppressed. In *Missouri v. Seibert*, —— U.S. ——, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), the Supreme Court considered the admissibility of statements made after belated *Miranda* warnings during continuing interrogations. In that case, a divided Court disapproved of a two-stage interrogation technique in which the police deliberately failed to provide *Miranda* warnings before an initial round of questioning until they elicited a confession from the suspect; the police then sought to have the suspect repeat the confession in a second interview that was conducted after *Miranda* warnings were given. An opinion written by Justice Souter and joined by Justices Stevens, Ginsburg, and Breyer described the controlling question as whether "a reasonable person in the suspect's shoes" would have understood the *Miranda* warnings as conveying a message that the suspect retained a genuine choice about continuing to talk. *Id.* 2612–13, 124 S.Ct. 2601 (plurality opinion). These Justices distinguished *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), which held that a suspect who has answered unwarned questions may, absent coercion, validly waive his rights and provide admissible statements after being ·warned,· by looking to several relevant considerations "that bear on whether *Miranda* warnings delivered midstream could . . . accomplish their object." *Seibert*, —— U.S. at ——, 124 S.Ct. at 2612. These considerations include "the completeness and detail of the questions and answers" in the first round of questioning, the degree to which· the content of the two rounds overlap, the timing and setting of the rounds of questioning, the continuity of law enforcement personnel, and the degree. to which the first and second rounds of questioning are

treated as continuous. *Id.* Justice Breyer, while "join[ing] the plurality's opinion in full," *id.* at ——, 124 S.Ct. at 2614 (Breyer, J., concurring), wrote separately to advocate a test that would "exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith," *id.* at 2613.

Justice Kennedy, who provided the fifth vote for the majority, wrote a concurring opinion advocating a different approach. He focused on the subjective intent of the police and sought to determine whether the two-stage interrogation was intentionally used to undermine the efficacy of the *Miranda* warnings. *Id.* at ——, 124 S.Ct. at 2615–16 (Kennedy, J., concurring in judgment). In his view, absent that intent the principles of *Elstad* controlled the outcome. *See Seibert,* —— U.S. at ——, 124 S.Ct. at 2616. Justice O'Connor wrote a dissent that Chief Justice Rehnquist and Justices Scalia and Thomas joined. In their minds, the legitimacy of the two-stage interrogation procedure would depend first on whether the initial statement was involuntary. If it was, they would ask whether the taint from the involuntary examination had dissipated through the passage of time or a change in circumstances. *Id.* at ——, 124 S.Ct. at 2619 (O'Connor, J., dissenting). "In addition, [the] second statement should be suppressed if [the suspect] showed that it was involuntary despite the *Miranda* warnings." *Id.*

▆ We conclude at the very least that a majority of the Court would uphold the district court's decision not to suppress the statements that Mr. Terry made during the second interview. The district court found "no evidence in the record of coercive or threatening tactics at either interview," and neither do we. There is no evidence that the police engaged in a deliberate strategy to undermine the *Miranda* warnings. Accordingly, the concerns of Justice Kennedy (and likely those of Justice Breyer) in *Seibert* are not present here. Neither is there any evidence that Mr. Terry's initial statement was involuntary. In fact, after being asked the initial question, Mr. Terry wanted to continue talking with Agent Bennett, but Agent Bennett terminated the interview because he thought that Mr. Terry was too intoxicated to continue. Because Mr. Terry's initial statement was voluntary and there is no claim that the second statement was involuntary, the four dissenting Justices would also conclude that Mr. Terry does not have a valid fifth amendment claim.

We also think that the Justices who joined in Justice Souter's opinion would conclude that Mr. Terry's statements are admissible. Although some of the considerations in that opinion might tend to undermine the district court's conclusion, we believe that a reasonable person in Mr. Terry's shoes would have understood the *Miranda* warnings that he was given as conveying a message that he retained a genuine choice about continuing to talk. While both interviews were conducted at the Pine Ridge jail by Agent Bennett, and the overlapping content of the questioning is critically relevant to this charge, these considerations alone do not tell the whole story. During the initial interview, Agent Bennett asked Mr. Terry only one question. He then waited overnight before renewing the interrogation. His second interview covered more ground, discussing both the firearm and the events at the Bettelyoun property the previous night. And, as stated earlier, there is no evidence that Agent Bennett used the multi-stage interrogation in a calculated way to undermine the *Miranda* warning.

For all of the above reasons, we conclude that the district court properly decided not to suppress the statements that

Mr. Terry made during the second interview.

### III.

Accordingly, we affirm the judgment of the district court.