**UNITED STATES of America,**
**Plaintiff,**

v.

**Derrick KEYS, Defendant.**

**No.  C4–05–037.**

United States District Court,
D. North Dakota,
Northwestern Division.

Oct. 12, 2005.

Timothy Q. Purdon, Vogel Law Firm, Bismarck, ND, for Defendant.

Paul R. Emerson, U.S. Attorneys, Bismarck, ND, for Plaintiff.

**ORDER**

HOVLAND, Chief Judge.

Before the Court are three separate motions filed by the defendant, Derrick Keys, on September 1, 2005. Two of the motions seek to suppress evidence, namely statements made to law enforcement officers by Keys and items seized pursuant to a seizure and search of Keys' vehicle on December 18, 2004. The third motion seeks dismissal of the Indictment based on the constitutionality of 18 U.S.C. § 922(g)(3). On September 23, 2005, the Government filed a consolidated response opposing each of the Defendant's motions. An evidentiary hearing was held on October 4, 2004, in Bismarck, North Dakota. For the reasons outlined below, the Court denies Keys' motion to suppress evidence seized from his vehicle, grants Keys' motion to suppress his statements, and denies Keys' motion to dismiss.

**I. BACKGROUND**

On Saturday, December 18, 2004, at approximately 2:30 p.m., Bureau of Indian Affairs Officers Tony Belgarde and Corbin House responded to a call for assistance placed by an employee at the Sky Dancer Hotel on the Turtle Mountain Indian Reservation in Belcourt, North Dakota. Upon arrival, the officers were informed that housekeeping had discovered possible drug paraphernalia in Room # 140 that was recently vacated by the occupants. The room was registered under the name Derrick Keys, of whom the officers were shown a photocopied drivers license. Hotel records reflected that upon checking out of Room # 140, its occupants relocated to Room # 142.

BIA Officers Belgarde and House entered the now vacated Room # 140 and examined what appeared to be a broken light bulb containing white residue. The officers suspected that the residue was methamphetamine. BIA narcotics investigator James Peach was contacted by the officers to conduct a field test of the residue.

In the meantime, Officer Belgarde knocked on the door of Room # 142. Officer Belgarde's notes recount the events that followed:

> I knocked on the door, a voice from inside Room # 142 asked who is it. I advised that it is the Police, the door was then opened by Jenny L. Decoteau. I seen a male standing behind Jenny Decoteau, I asked him if he was Derrick Keys. The male replied "NO", I then said "YES YOU ARE". I, Officer Tony Belgarde identified Derrick Keys from

the photo I.D. from the Sky Dancer Hotel Registry.[1]

(footnote added).

Once inside, Officer Belgarde noticed a large knife on the bed. *See* Exhibit No. 5. At approximately 5:00 p.m. all four of the room's occupants, which included Jenny DeCoteau, Derrick Keys, Darwin Anderson, and Karen Hess, were removed and taken to another room for safety reasons. Keys and Anderson were handcuffed.

Officer Peach arrived sometime thereafter and conducted a field test of the broken glass containing the white residue found in Room # 140. The residue tested positive for methamphetamine. Officer Peach then questioned the four occupants in regards to his discovery. Of the four occupants, only DeCoteau claimed ownership of the methamphetamine.

The BIA officers attempted to obtain consent to search Room # 142, but failed. As a result, the officers obtained a search warrant from Tribal Court Judge Madonna Marcellais. Thereafter, a search of Room # 142 uncovered the following items: (1) a digital scale; (2) 13 grams of marijuana; (3) two keys; (4) 48 grams of methamphetamine;[2] (5) a box of 9mm shells; and (6) a loaded 9mm clip.[3] All four occupants were brought to the Belcourt Police Department after the search, but only Jenny DeCoteau was arrested.

BIA Officer Peach then searched the Sky Dancer Hotel parking lot in an attempt to locate Derrick Keys' 1998 Chrysler van.[4] After spotting what he believed to be Keys' vehicle, he radioed dispatch to confirm the license plate numbers.[5] Upon receiving confirmation, Officer Peach impounded the van believing that the van contained further evidence of criminal activity in the form of drugs, firearms, and ammunition. Consequently, the van was towed back to the Belcourt Police Department.

Sometime after the four individuals arrived at the Belcourt Police Department, suspicion arose concerning whether Derrick Keys was an Indian/Native American. At the time of his booking, Keys listed his race as Caucasian. None of the officers involved knew whether Keys was Indian/Native American, but several believed that there were individuals with the last name "Keys" who were enrolled at either Fort Berthold Indian Reservation or Standing Rock Indian Reservation.

To aid in the determination, officers consulted the Belcourt Police Department's internal records. The records indicated Keys' race as "White." *See* Defendant's Ex. 22. That information was generated from a May 25, 2004, arrest in tribal court on charges of domestic abuse. The records reflect that Keys had been arrested on charges of domestic abuse on May 25, 2004, but was released to state officials in Rolette County that same day, a common practice by the Belcourt Police Department if they lack jurisdiction over a suspect. In fact, Rolette County Sheriff Tony Sims came to the Belcourt Police Station that evening to assist.

---

1. Officer Belgarde testified that he had known of Derrick Keys, but did not know whether he was white or Indian/Native American. Officer Belgarde knew that Keys lived near New Town, North Dakota, which lies within the exterior boundaries of the Fort Berthold Indian Reservation.

2. The keys and the methamphetamine were found inside a red fanny pack on the bed.

3. The box of shells and the clip were found inside a grey backpack.

4. Peach testified that he was familiar with Keys' van based on a previous encounter with the Defendant.

5. The van was legally parked in the Sky Dancer Hotel parking lot.

Further investigation was undertaken by BIA Officer Gerald Medrud who accessed Keys' criminal history from the National Crime Information Center (NCIC). The NCIC records were ambiguous regarding Keys' race. The records contain four notations stating that Keys was Caucasian, and two notations stating that Keys was Indian/Native American. *See* Defendant's Ex. 23. BIA Officer Medrud also searched the enrollment books at the Belcourt Police Department, but found no "Derrick Keys." [6] Officer Medrud was admittedly confused, but on Saturday, December 18, 2004, he reasonably believed that Keys was an Indian/Native American, and relayed that information to Officer Peach.

At approximately 9:35 p.m on December 18, 2004, BIA Officers Gerald Medrud and Kieth Harviell questioned Derrick Keys at the Belcourt Police Department. After being fully advised of his *Miranda* rights, Keys signed a waiver of rights form. *See* Exhibit No. 7. Keys began telling the officers about his family and his relationship to Jenny DeCoteau, but questioning was terminated because Keys stated that his head was "fuzzy" and wanted to "sleep it off."

At approximately 10:00 p.m. on December 18, 2004, BIA officers began searching Keys' 1998 Chrysler van at the Belcourt Police Department. BIA Officer Kelan Gourneau, one of the officers participating in the search, found 9mm ammunition on the floorboard and a coat on the backseat containing a 9mm handgun. Upon discovering the handgun, the search was stopped by BIA Officer Peach because he felt it was no longer an impound search. He felt the search could be continued by obtaining a warrant.

The next day was Sunday, December 19th. There was no activity on that day. However, Keys, DeCoteau, Anderson, and Hess remained in custody at the Belcourt Police Department.

On Monday, December 20, 2004, BIA Officer Medrud spent the morning contacting officials from the Fort Berthold Indian Reservation and the Standing Rock Indian Reservation in hopes of obtaining enrollment information regarding Derrick Keys. It was clear after the phone calls that Keys was not an enrolled member of any tribe in North Dakota.

BIA Officer Medrud then re-questioned Keys at approximately 2:30 p.m. on December 20, 2004. Prior to the interview, Officer Medrud informed Keys that he would be released after the questioning. Keys was taken through his waiver of rights form signed on December 18th. Keys indicated that he was aware of his *Miranda* rights and was again willing to voluntarily talk to the officer. During the questioning, Keys made several admissions regarding his drug use and ownership of a 9mm handgun.

For purposes of securing a warrant to continue the search of Keys' 1998 Chrysler van, BIA Officer Peach prepared an affidavit which read in relevant part as follows:

1.

Jenny DeCoteau, Derrick Keys, Darwin Anderson and Karen Hess traveled to Belcourt North Dakota using Derrick Keys' 1998 White Chrysler Van with North Dakota State plates HDV811 and rent room # 142 at the Sky Dancer Hotel.

2.

Methamphetamine, Marijuana, ammunitions, knife, and Drug Paraphernalia

---

6. BIA Officer Medrud testified that these books contain the names of enrolled members of the Turtle Mountain Indian Reservation who voted in the previous election.

were found inside room # 142 of the Sky Dancer Hotel. Jenny DeCoteau rented room # 142 at the Sky Dancer Hotel. A complaint was received by Belcourt Police Department from the Sky Dancer Hotel personnel of Drugs and Drug Paraphernalia in room # 140 of the Sky Dancer Hotel, a room also rented by Jenny DeCoteau and Derrick Keys.

### 3.

A search warrant was requested by Officer Tony Belgarde and issued for room # 142 of the Sky Dancer Hotel, Methamphetamine, Marijuana, ammunitions and Drug Paraphernalia were found inside room # 142 of the Sky Dancer Hotel.

### 4.

All subjects from the Sky Dancer Hotel were detained and brought to the Belcourt Police Department, the Keys Vehicle was located in the parking lot of the Sky Dancer Hotel by Officer Corbin House and Jim Peach and towed to the police department for impound.

### 5.

Officer Belgarde started the impound sheet of the Keys vehicle, after locating ammunitions and a firearm he stopped the impound sheet, the Keys vehicle was locked up and secured inside the garage of the Belcourt Police Department.

### 6.

Officer Peach radioed for Sheriff Tony Sims for assistance with the Keys vehicle, Sheriff Sims came to the Belcourt police department, Sims was briefed on the incident, Sims placed a called to Mary O'Donald, States Attorney for Rolette County and advised her of the incident, O'Donald advised us to stop with the vehicle impound sheet of the Keys vehicle and apply for a state search warrant on Monday, December 20, 2004.

### 7.

The reason Sheriff Sims was brought in for assistance on Keys vehicle, it was believed by law enforcement that Derrick Keys was Caucasion, it was also believed that the search of the vehicle would have to done by Rolette Sheriff's office.

### 8.

Criminal Investigator for the BIA, Gerald Medrud conducted a back ground check on Derrick Keys and discovered Derrick Keys to be an Indian.

*See* Defendant's Ex. 20. Based on the affidavit, Tribal Judge Madonna Marcellais signed a search warrant for the van on December 20, 2004. *See* Defendant's Ex. 21. A complete search of the van was conducted that day. After the search, Keys was released from custody.

On April 27, 2005, Derrick Keys was indicted on one court of Possession of Firearm and Ammunition by an Unlawful User of a Controlled Substance in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2).

## II. *LEGAL DISCUSSION*

The Defendant seeks to suppress both the evidence obtained from the 1998 Chrysler van and statements made to BIA Officer Medrud on December 20, 2004. Additionally, the Defendant seeks dismissal of the Indictment challenging the constitutionality of 18 U.S.C. § 922(g)(3).

### A. *SEIZURE AND SEARCH OF THE VAN*

The Fourth Amendment secures the persons, houses, papers, and effects of the people against unreasonable searches and seizures by the government. The general rule is that the government must secure a warrant before conducting a search. *United States v. Alberts,* 721 F.2d 636, 638

(8th Cir.1983). "Warrantless searches are presumptively unreasonable absent some exception to the warrant requirement." *United States v. Kuenstler,* 325 F.3d 1015, 1021 (8th Cir.2003) (citing *United States v. Duchi,* 906 F.2d 1278, 1282 (8th Cir.1990)). The Court will address the applicable exceptions in this case.

### 1. *INVENTORY SEARCH*

"Law enforcement may search a lawfully impounded vehicle to compile an inventory list of the vehicle's contents without violating the Fourth Amendment." *United States v. Rowland,* 341 F.3d 774, 779 (8th Cir.2003) (citing *South Dakota v. Opperman,* 428 U.S. 364, 376, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976)). These searches can be conducted without a search warrant or probable cause. *Rowland,* 341 F.3d 774, 779. The inventory search exception to the warrant requirement was created because police are performing an "administrative or caretaking function rather than a criminal investigatory function when they impound an automobile." *United States v. Marshall,* 986 F.2d 1171, 1174 (8th Cir.1993). Inventory searches "serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Colorado v. Bertine,* 479 U.S. 367, 372, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987).

The relevant inquiry is whether, under the totality of the circumstances, the inventory search was reasonable. Inventory searches will be considered reasonable if "conducted according to standardized police procedures, which vitiate concerns of an investigatory motive or excessive discretion." *United States v. Marshall,* 986 F.2d 1171, 1174 (8th Cir.1993) (citing *Opperman,* 428 U.S. 364, 372, 96 S.Ct. 3092, 49 L.Ed.2d 1000; *Bertine,* 479 U.S. 367,

376, 107 S.Ct. 738, 93 L.Ed.2d 739; *Florida v. Wells,* 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990)). Stated differently, "[P]olice may exercise discretion to impound a vehicle, 'so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.' " *United States v. Petty,* 367 F.3d 1009, 1012 (8th Cir.2004) (quoting *Bertine,* 479 U.S. 367, 375, 107 S.Ct. 738, 93 L.Ed.2d 739)). To that end, "[s]ome degree of 'standardized criteria' or 'established routine' must regulate such police actions, which may be conducted without the safeguards of a warrant or probable cause, to ensure that impoundments and inventory searches are not merely 'a ruse for general rummaging in order to discover incriminating evidence.' " *Petty,* 367 F.3d 1009, 1012 (quoting *Wells,* 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1)).

■ At the evidentiary hearing on October 4, 2004, BIA Officer Peach testified that the reason he impounded the van was because he believed there was additional evidence that may be found inside, namely drugs, firearms, and ammunition. In other words, the decision was based solely on a "suspicion of criminal activity" with a motive "to discover incriminating evidence." *See United States v. Petty,* 367 F.3d 1009, 1012 (8th Cir.2004). Such a justification is clearly improper under the inventory search exception. As a result, the inventory search exception does not obviate the need for a warrant in this case.

### 2. *SEARCH INCIDENT TO AR-REST* [7]

"It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment." *United States v. Robinson,*

---

7. Neither party addressed this exception.

414 U.S. 218, 224, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Under the search incident to arrest doctrine, an arresting officer may search the arrestee and the area within the arrestee's immediate control where he may reach to obtain a weapon or destroy evidence. *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *see United States v. Lyons,* 706 F.2d 321, 330 (D.C.Cir.1983) (quoting *United States v. Mapp,* 476 F.2d 67, 80 (2d Cir.1973)) ("To determine whether a warrantless search incident to an arrest exceeded constitutional bounds, a court must ask: was the area in question, at the time it was searched, conceivably accessible to the arrestee—assuming that he was neither 'an acrobat [nor] a Houdini.'"). The United States Supreme Court has outlined "the two historical rationales for the 'search incident to arrest' exception: (1) the need to disarm the suspect in order to take him into custody, and (2) the need to preserve evidence for later use at trial." *Knowles v. Iowa,* 525 U.S. 113, 116, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998).

The doctrine has equal force in the realm of automobile arrests. In *New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), the United States Supreme Court held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." The Supreme Court later confirmed that "*Belton* allows police to search the passenger compartment of a vehicle incident to a lawful arrest of both 'occupants' and 'recent occupants.'" *Thornton v. United States,* 541 U.S. 615,

124 S.Ct. 2127, 2131, 158 L.Ed.2d 905 (2004).

With that being said, the doctrine may not be invoked in instances where the arrestee is located some distance from their vehicle. *See United States v. Pollard,* 466 F.2d 1, 4 (10th Cir.1972) ("the fact that the agents had probable cause to arrest Pollard does not in itself justify a warrantless search of his vehicle, since the search of the car, as opposed to the search of the motel room, cannot be justified as an incident to an arrest."); *United States v. Holly,* 219 F.Supp.2d 117, 127 (D.D.C.2002) (holding that an arrestee's vehicle located across the street could not be a search incident to arrest); *United States v. Mendez,* 139 F.Supp.2d 273, 279 (D.Conn.2001) ("Because the defendant was in the convenience store at the time of his arrest, the passenger compartment of the Chevrolet [parked in the parking lot] was well outside the defendant's grabbing area and consequently, the search does not pass the reasonableness test under *Chimel,* and was not a valid search-incident-to-arrest."). As stated by the Supreme Court, "[o]nce an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest." *Chambers v. Maroney,* 399 U.S. 42, 47, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

■ It is undisputed that Derrick Keys was detained[8] inside the Sky Dancer Hotel and his van was parked outside the hotel in the parking lot. Under the circumstances, the seizure and search did not serve either of the historical rationales for the exception: the search was not needed

---

8. It should also be noted that Keys was not formally "arrested" in the Sky Dancer Hotel. The officers testified that he was merely detained. If this exception were to be further explored it would be necessary to determine whether his detainment would amount to an "arrest" for purposes of the search incident to

arrest exception. *See United States v. Pratt,* 355 F.3d 1119, 1122–23 (8th Cir.2004) (explaining that a "seizure" may constitute an "arrest" under the search incident to arrest exception when the officers have probable cause).

to disarm Keys in order to take him into custody, nor was a search needed to preserve evidence for later use at trial. Even if a search incident to arrest was permissible, the van could not be described as being within Keys' "immediate control" under even the most liberal construction of the phrase. As a result, the search incident to arrest exception does not obviate the need for a warrant in this case.

### 3. *AUTOMOBILE EXCEPTION*

It is well-established that law enforcement officers may conduct a warrantless search of a vehicle as long as the officers have probable cause to believe the vehicle contains contraband or other evidence of illegal activity. *United States v. Fladten,* 230 F.3d 1083, 1085 (8th Cir.2000). In other words, when police have probable cause to search a vehicle, the Fourth Amendment does not require a warrant. *See Pennsylvania v. Labron,* 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996). Although exigent circumstances were once a concern, the United States Supreme Court has made clear that "the automobile exception does not have a separate exigency requirement . . . ." *Maryland v. Dyson,* 527 U.S. 465, 467, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999). Further, it is not necessary that such a warrantless search be conducted at the moment the vehicle is seized. The search may be conducted even after the vehicle has been impounded. *United States v. Johns,* 469 U.S. 478, 484, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985). *See Capraro v. Bunt,* 44 F.3d 690, 691 (8th Cir.1995). Although it is certainly "advisable," "better practice," and "just plain smarter" for officers to first obtain a search warrant whenever possible, the failure to do so will not invalidate a vehicle search based on probable cause. *United States v. Perry,* 925 F.2d 1077, 1081 (8th Cir.1991).

"Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten,* 230 F.3d 1083, 1085 (8th Cir.2000) (citing *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). "Probable cause may be based on the collective knowledge of all law enforcement officers in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication." *United States v. Wells,* 347 F.3d 280, 287 (8th Cir.2003).

■ As previously noted, BIA Officer Peach seized Keys' 1998 Chrysler van based the reasonable belief that the vehicle contained contraband in the form of drugs, firearms, and ammunition. In reaching such a determination, Officer Peach, or the assisting BIA officers, were aware of the following information: (1) Room # 140 at the Sky Dancer Hotel was registered under the name "Derrick Keys" and had been occupied by Keys and three friends on and before December 18, 2004; (2) after Keys and his friends vacated the room, a white substance found in Room # 140 field tested positive for methamphetamine; (3) that Keys and his friends moved across the hall to Room # 142 of the Sky Dancer Hotel which was found to contain a large knife, a digital scale, 13 grams of marijuana, two keys (at least one of which was a Chrysler vehicle key), 48 grams of methamphetamine, a box of 9mm shells, and a loaded 9mm clip; and (4) it was understood by the officers that Keys, DeCoteau, Anderson, and Hess had traveled to the Sky Dancer Hotel together in the Chrysler van. Based upon that information, known by either BIA Officer Peach specifically, or the other BIA investigating officers collectively, the Court finds that there was a "fair probability" the van contained contraband.

It should be noted that this automobile search would have been a non-issue had the BIA law enforcement officers simply obtained a search warrant. The same facts as articulated above by the Court, if presented to a judge, could have supported a finding of probable cause to secure a warrant. It cannot be said that time was of the essence as all four individuals were in BIA custody at the time the van was seized and searched. Under the circumstances, it is clear that the better practice would have been to obtain a warrant. However, having established that probable cause existed, the automobile exception is triggered. As a result, the warrantless seizure and search of the van was permissible under the current state of the law.

### B. *KEYS' STATEMENTS TO BIA OFFICER MEDRUD*

The thrust of the Defendant's argument is that his detainment was unlawful in light of the recent Eighth Circuit case of *United States v. Terry*, 400 F.3d 575 (8th Cir. 2005). If true, any statements of Keys elicited by BIA Officer Medrud would be inadmissible. Conversely, the Government cites *Terry* for the proposition that Keys' detainment was permissible under the circumstances. A review of *Terry* is appropriate.

In *Terry*, tribal officers of the Oglala Sioux Tribe Department of Public Safety responded to a domestic violence complaint on the Pine Ridge Indian Reservation. Upon arriving, the officers located the suspect, Randy Terry, handcuffed him, and placed him in the back seat of a patrol car. "At that time, the officers did not know if Mr. Terry was an Indian: Their common practice was to detain a suspect first and then determine race, and they followed that practice in this case." *Terry*, 400 F.3d 575, 578. Shortly thereafter, the officers discovered that Terry was likely a non-Indian and called the Sheriff of Shannon County, South Dakota, to advise him

of that fact. The Sheriff was at his home approximately eighty miles from the Pine Ridge Reservation. He asked the officers to hold Terry until he could pick him up the next morning. The Eighth Circuit noted, "It was not unusual for [the Sheriff] to ask tribal police to hold a suspect for up to eight hours because, at that time, he had only one patrol car and a single part-time deputy." *Id.* at 579. As promised, the Sheriff picked up Terry the next day.

Terry, among other things, was challenging his seizure by tribal officials. The Eighth Circuit began its opinion by reaffirming that non-Indians are not subject to the criminal jurisdiction of an Indian tribe. 400 F.3d 575, 579 (citing *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 195, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978)). However, "officers do not lack authority to detain non-Indians whose conduct disturbs the public order on their reservation." *Id.* The Eighth Circuit explained the origin of such inherent power:

> The Supreme Court has recognized that tribal law enforcement authorities possess "traditional and undisputed power to exclude persons whom they deem to be undesirable from tribal lands," and therefore have "the power to restrain those who disturb public order on the reservation, and if necessary to eject them." *Duro v. Reina*, 495 U.S. 676, 696–97, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990). "Where jurisdiction to try and punish an offender rests outside the tribe, tribal officers may exercise their power to detain the offender and transport him to the proper authorities." *Id.* at 697, 110 S.Ct. 2053; *see also Strate v. A-1 Contractors*, 520 U.S. 438, 456 n. 11, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997). Because the power of tribal authorities to exclude non-Indian law violators from the reservation would be meaningless if tribal police were not empowered to investigate such violations, tribal police

must have such power. *See Ortiz–Barraza v. United States,* 512 F.2d 1176, 1180 (9th Cir.1975). When exercising this power, however, tribal officers must avoid effecting a constitutionally unreasonable search or seizure. *See* 25 U.S.C. § 1302(2).

*Terry,* 400 F.3d 575, 579–80.

After a review of the pertinent law, the Eighth Circuit concluded "that the Oglala tribal officers' detention of Mr. Terry falls within the rule of *Duro.*" 400 F.3d 575, 580. In doing so, the Court found that Terry was being held by tribal officials pursuant to the express instruction and authority of the Sheriff. "[W]e cannot say that the tribal officers held Mr. Terry for an unreasonable amount of time in the circumstances, since Sheriff Daggett was eighty miles away on a rainy night and his only deputy was unavailable." *Id.*

While the facts of *Terry* are easily distinguishable, the case clearly establishes the rule of law that tribal officers can detain non-Indians whose conduct disturbs the public order on their reservation, so long as such a seizure is not unreasonable under the circumstances. With respect to Derrick Keys, the Court finds that his detention became unreasonable after the morning of Monday, December 20, 2004.

As a general rule, statements that result from an illegal detention are not admissible. *United States v. Hernandez–Hernandez,* 384 F.3d 562, 565 (8th Cir.2004). However, the statements may be admitted in certain circumstances.

The causal chain between an illegal arrest and a statement given later is broken, however, if the statement is sufficiently an act of free will to purge the primary taint. The giving of *Miranda* warnings, followed by the making of a voluntary statement, does not, in and of itself, mandate a statement's admissibility. Instead, to decide whether a confession is the product of a free will, courts consider *Miranda* warnings, the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct.

*Id.* (internal quotations and citation omitted).

It is clear that the BIA officers were genuinely confused about Keys' race on the evening of December 18, 2004. Information to which they had access was ambiguous and attempts to resolve the problem were largely unsuccessful. However, on the morning of December 20, 2004, BIA Officer Medrud contacted the enrollment offices at Fort Berthold Indian Reservation and Standing Rock Indian Reservation and it became clear that Keys was a non-Indian. After those calls, but prior to the questioning of Keys, Officer Medrud informed Keys that he would be released after the interview, no matter the outcome. It stands to reason that such a decision was made by BIA officers because they clearly had no jurisdiction over Keys. Following *Terry,* the Court finds that the BIA officers could have, and should have, released Keys prior to the interview conducted on the afternoon of December 20, 2004. To fail to release Keys before the interview was unreasonable and unwarranted under the circumstances. The Court has carefully considered the factors which could allow for the admissibility of such statements and finds these factors are not present in this factual scenario. As a result, the statements elicited from Keys during the unlawful detention must be suppressed.

## C. *VOID FOR VAGUENESS—18 U.S.C. § 922(g)(3)*

Several cases have examined the propriety of resolving "void for vagueness" argu-

ments prior to trial. Recently, Judge Ralph Erickson ruled that a vagueness challenge to 18 U.S.C. § 922(g)(3) would have to be resolved after trial. *United States v. Grey Water*, No. C2–04–145, 2005 WL 548423 (D.N.D. Jan.31, 2005). Another court in the Eighth Circuit similarly declined ruling on a vagueness challenge to 18 U.S.C. § 922(g)(3) until after trial. *United States v. Barnett*, No. CR02–4099–MWB, 2004 WL 764128 (N.D.Iowa April 9, 2004). In doing so, the court reasoned:

> Despite the body of case law available to assist the court in considering [the defendant's] vagueness challenge, it would be premature for the court to offer any recommendation regarding [the defendant's] motion at this time. The United States Supreme Court has explained:
>
> > It is well established that vagueness challenges to statutes which do not involve the First Amendment freedoms must be examined in the light of the facts of the case at hand. *United States v. National Dairy Products Corp.*, 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963).
>
> *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). *See United States v. Reed*, 114 F.3d 1067 (10th Cir.1997) (error for court to consider vagueness challenge to section 922(g) prior to trial, even upon government's proffer of facts to which defendant did not object; "such a sensitive and fact intensive analysis ... should be based only on the facts as they emerge at trial;" noting district court's concern was valid that the statute does not provide a time frame within which the unlawful use of controlled substance must occur for someone to be an "unlawful user") (citing *Reed*, 924 F.Supp. at 1055).

*Id.* at *12.

In *United States v. Bastian*, 112 F.Supp.2d 378, 380 (S.D.N.Y.2000), the court set forth the following discussion of pre-trial ruling:

> Challenges to § 922(g)(3) similar to [the defendant's] on vagueness grounds have been considered and rejected by several circuit courts, but only in the context of a direct appeal from a trial- after the record have been fully developed. *See United States v. Edwards*, 182 F.3d 333 (5th Cir.1999); *United States v. Terrell*, 172 F.3d 880 (10th Cir.1999); *United States v. Oberlin*, 145 F.3d 1343 (9th Cir.1998). [The defendant] raises his vagueness challenge in this pre-trial motion to dismiss, based on the indictment alone.
>
> In *United States v. Reed*, a case squarely on point, the Tenth Circuit held that the district court impermissibly determined the constitutionality of § 922(g)(3) on a pre-trial motion to dismiss before the Government has presented any evidence concerning the defendant's conduct. *See* 114 F.3d 1067, 1070 (10th Cir.1997). Though the Government made a proffer of its evidence before the district court decided the motion to dismiss, the Tenth Circuit nevertheless concluded that "such a sensitive and fact intensive analysis ... should be based only on the facts as they emerge at trial." *Id.* "A proffer," the court observed, "is not evidence, ipso facto." *Id.*
>
> The Court concurs with the Tenth Circuit's reasoning and conclusion in *Reed*. Heeding the Supreme Court's admonition that a vagueness challenge to a statute may only be examined in light of the facts of the case at hand, this Court cannot conduct a proper examination of the application of § 922(g)(3) to [the defendant's] case on the basis of the indictment alone. Accordingly, [the defendant's] motion is denied without prejudice. [The defendant] may renew his argument at a later stage of the proceeding, after the Government's evi-

dence pertinent to the issues [the defendant] raises has been adduced at trial. *Id.*

Based on the foregoing, the Court denies the motion to dismiss without prejudice and declines to rule on the Defendant's vagueness challenge to 18 U.S.C. § 922(g)(3) at this time. If need be, the Defendant may renew the motion after the facts have been developed at trial.

### III. *CONCLUSION*

For the reasons set forth above, the Defendant's "Motion to Suppress Evidence Seized from Derrick Keys' Vehicle on December 18, 2004, and December 20, 2004" is **DENIED** (Docket No. 16); the Defendant's "Motion to Suppress Statements by Derrick Keys to Law Enforcement on December 20, 2004" is **GRANTED** (Docket No. 18); and the Defendant's "Motion to Dismiss Indictment" is **DENIED** without prejudice (Docket No. 20).

**IT IS SO ORDERED.**