216 P.3d 382 (2009)
STATE of Washington, Respondent,
v.
Loretta L. ERIKSEN, Petitioner.
No. 80653-5.
Supreme Court of Washington, En Banc.
Argued May 12, 2009.
Decided September 17, 2009.
*384 William Joseph Johnston, Bellingham, WA, for Petitioner.
Ann Lindsay Stodola, Bellingham, WA, for Respondent.
Mary Michelle Neil, Bellingham, WA, for Amicus Curiae on behalf of Lummi Nation.
SANDERS, J.
¶ 1 A Lummi Nation tribal police officer witnessed a motorist on the reservation driving at night with high beams and drifting across the center divider. Did the officer have authority to continue pursuing this vehicle beyond the reservation's borders and then detain the non-Indian driver until authorities with jurisdiction to arrest for DUI[1] arrived? This is an issue of first impression. We hold tribal officers have inherent sovereign authority and statutory authority to continue "fresh pursuit" of motorists who break traffic laws on the reservation and then drive off the reservation. Therefore we affirm the trial court.

FACTS
¶ 2 Officer Mike McSwain of the Lummi Nation Police Department (LNPD) was patrolling the Lummi reservation sometime after 1:30 a.m. on August 10, 2005 when he observed a vehicle driving toward him on Slater Road with its high beams glaring. Officer McSwain flashed his headlights to remind the driver (later identified as Loretta Eriksen) to dim the brights, but the driver did not comply. Officer McSwain slowed his patrol car to prepare to turn around and pursue the driver.[2] But "as the vehicle approached, it drifted across the center line into my lane of travel coming within a couple feet of my vehicle," Officer McSwain testified. Clerk's Papers (CP) at 23 (Tr. (Jan. 26, 2006) at 8). "At that point, you know, I came to an immediate stop, getting ready to swerve in case it continued." Id. As the vehicle drifted back into its lane, Officer McSwain observed a second car following very closely behind the drifting vehicle. Officer McSwain turned his patrol car around, activated his emergency lights, and began pursuing both cars westbound on Slater Road.
¶ 3 After traveling roughly a quarter mile the cars turned into a gas station located off the Lummi reservation. The second car broke off, went around the west side of the station, and disappeared from Officer McSwain's line of sight. Officer McSwain pulled behind the first car and observed the passenger jump from the vehicle and run to the driver's side, while the driver  soon to be identified as Eriksen  hopped over the center console and into the passenger's seat. Officer McSwain commanded Eriksen and the passenger to stop moving and put their hands where he could see them. Then he called for backup. Two LNPD patrol cars arrived less than five minutes later.[3]
*385 ¶ 4 Officer McSwain then asked Eriksen why she had jumped into the passenger seat. Eriksen said  in slightly slurred speech  she had not been driving, so Officer McSwain warned her about making false statements. He also observed her eyes were watery and bloodshot and she smelled strongly of alcohol. Officer McSwain determined neither woman was a tribal member so he contacted the Whatcom County Sheriff's Office, which is standard procedure for stops involving nontribal members.
¶ 5 Officer McSwain asked Eriksen to step out of her car and follow him to his patrol vehicle. He noticed "she was having difficulty keeping her balance and walking," and "she began to sway back and forth ... [as he] started to explain to her what was going on. ..." CP at 32 (Tr. (Jan. 26, 2006) at 17). Officer McSwain advised Eriksen that she would be detained but not arrested and a sheriff's deputy would make a final determination. McSwain did not administer any sobriety tests and testified Eriksen would not take any tests. He then handcuffed Eriksen and placed her in the back of his patrol car until the Whatcom County sheriff's deputy arrived. Officer McSwain remained on the scene until the deputy arrested Eriksen for DUI.
¶ 6 The trial court convicted Eriksen of DUI and denied her motion for reconsideration. The court reasoned the Lummi Nation's inherent sovereign power  which includes enforcing internal criminal laws  authorizes tribal police to continue pursuing offenders who drive off the reservation. The court concluded it would be inconsistent with this power, and Washington's policy of authorizing officers to cross jurisdictional boundaries when in "fresh pursuit," for "somebody [to] just cross the line and be scott-free." Verbatim Report of Proceedings (VRP) (Aug. 20, 2007) at 40-41. We granted Eriksen's motion for discretionary review to resolve this issue of first impression.

STANDARD OF REVIEW
¶ 7 Jurisdictional disputes on Indian reservations involve overlapping federal, state, and tribal jurisdiction. State v. Schmuck, 121 Wash.2d 373, 380, 850 P.2d 1332 (1993).[4] Jurisdiction is a matter of law which we review de novo when the location of a crime is not in dispute.[5]State v. Waters, 93 Wash.App. 969, 976, 971 P.2d 538 (1999) (citing State v. L.J.M., 129 Wash.2d 386, 396, 918 P.2d 898 (1996)).
¶ 8 Whether a tribe has authority to stop and detain an individual necessarily turns on an analysis of the limited sovereignty the tribe retains. Schmuck, 121 Wash.2d at 380, 850 P.2d 1332. Tribes are "unique aggregations possessing attributes of sovereignty over both their members and their territory." United States v. Mazurie, 419 U.S. 544, 557, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). "Intrinsic in this sovereignty is the power of a tribe to create and administer a criminal justice system." Ortiz-Barraza v. *386 United States, 512 F.2d 1176, 1179 (9th Cir. 1975). Tribal sovereignty is preserved unless Congress's intent to the contrary is clear and unambiguous. White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 142, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). Treaties, agreements, and statutes must be liberally construed in favor of the tribe, and all ambiguities are to be resolved in its favor. Choctaw Nation of Indians v. United States, 318 U.S. 423, 431-32, 63 S.Ct. 672, 87 L.Ed. 877 (1943) ("[T]reaties are construed more liberally than private agreements. ... Especially is this true in interpreting treaties and agreements with the Indians[, which are to be construed] `in a spirit which generously recognizes the full obligation of this nation to protect the interests of [the Indians].'" (quoting Tulee v. Washington, 315 U.S. 681, 684-85, 62 S.Ct. 862, 86 L.Ed. 1115 (1942))).

ANALYSIS
¶ 9 The parties agree on appeal that the incident began on the Lummi Reservation; therefore the narrow issue before us is whether Officer McSwain had authority to stop a non-Indian driver, who pulled over after she crossed the reservation's boundary, and then detain her until a deputy with jurisdiction to arrest arrived.[6]

I. Lummi Nation Has Sovereign Authority and U.S. Treaty Obligation To Stop and Detain Lawbreakers on the Reservation
¶ 10 Tribal police officers are often first responders when problems arise on reservations, but it is not always apparent during the investigation stage whether the tribe possesses jurisdiction over the offender.[7] In recognition of this problem the Supreme Court has consistently affirmed tribal police have authority to detain non-Indian offenders until they can be turned over to authorities with jurisdiction. Duro v. Reina, 495 U.S. 676, 697, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990); Strate v. A-1 Contractors, 520 U.S. 438, 456 n. 11, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997) (citing Schmuck, 121 Wash.2d at 390, 850 P.2d 1332).
¶ 11 This court  along with the Ninth and Eighth Circuit Courts of Appeals  has also held tribal police have inherent authority to stop non-Indians who violate the law on public roads within the reservation and detain them until they can be turned over to state authorities. See, e.g., Schmuck, 121 Wash.2d at 396, 850 P.2d 1332; Ortiz-Barraza, 512 F.2d at 1180 (holding tribal officer was authorized to stop and search non-Indian driver on the reservation); United States v. Terry, 400 F.3d 575, 579-80 (8th Cir.2005) (upholding overnight detention of a non-Indian in a tribal jail when state law enforcement officials could not take custody until the next morning).[8] The superior court therefore correctly looked to this court's analysis in Schmuck as a starting point.
¶ 12 As in Schmuck the Lummi Nation does not assert authority to arrest and prosecute Eriksen for DUI but merely claims the power to stop and detain her until she could be turned over to Whatcom County officials. Schmuck, 121 Wash.2d at 379, 850 P.2d 1332. "The Nation is asserting a sovereign interest *387 in the act of stopping and detaining any person who violates the law while on the Lummi Reservation, even if the tribal police officer cannot complete the stop until after the motorist has driven beyond the Reservation boundaries." Br. of Amicus Curiae Lummi Nation at 5.
¶ 13 Absent a controlling congressional statute, tribes retain jurisdiction over events in Indian country: "Perhaps the most basic principle of all Indian law, supported by a host of decisions, is that those powers lawfully vested in an Indian nation are not, in general, delegated powers granted by express acts of Congress, but rather `inherent powers of a limited sovereignty which has never been extinguished.'" COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 4.01[1][a] at 206 (2005) (quoting United States v. Wheeler, 435 U.S. 313, 322-23, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978)). Therefore Congress may constitutionally execute provisions of a treaty even if so doing affects state interests. Antoine v. Washington, 420 U.S. 194, 203-05, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975) (absence of State as party to hunting and fishing agreements did not detract from validity). Congress's authority over Indian affairs is "plenary and exclusive," which refers to supremacy of federal over state law. Washington v. Confederated Bands & Tribes of the Yakima Indian Nation, 439 U.S. 463, 470-71, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979). In Schmuck we recognized that tribes retain their existing sovereign powers until Congress acts. 121 Wash.2d at 380, 850 P.2d 1332.
¶ 14 In 1855 the Lummi Nation and the United States entered into the Treaty of Point Elliott, which established the Lummi Reservation. 12 Stat. 927 (1855).[9] Article 9 of the treaty expressly provides that the tribes shall turn over to government authorities anyone who violates United States law: "[T]he said tribes agree not to shelter or conceal offenders against the laws of the United States, but to deliver them up to the authorities for trial." Thus the Lummi Nation is obliged by treaty to turn over lawbreakers rather than create safe havens for them to act with impunity. Schmuck, 121 Wash.2d at 385, 850 P.2d 1332 (noting Article 9 reflected concern that non-Indians would attempt to avoid prosecution by hiding out on reservations (citing H.R.Rep. No. 474, 23rd Cong., 1st Sess., at 98 (1834))).
¶ 15 As sovereigns, tribes exercise at least concurrent jurisdiction over all crimes committed by Indians in Indian country. Wheeler, 435 U.S. at 328-29, 98 S.Ct. 1079. Tribes have an inherent power of self-governance, which includes the power to prescribe and enforce internal criminal laws. Schmuck, 121 Wash.2d at 381-82, 850 P.2d 1332 (citing Wheeler, 435 U.S. at 326, 98 S.Ct. 1079). "Given the inherent mobility of a driving offense, the fresh pursuit doctrine is a necessary means of cooperatively enforcing traffic laws to ensure public safety." Vance v. Dep't of Licensing, 116 Wash.App. 412, 416, 65 P.3d 668 (2003) (emphasis added) (citing City of Tacoma v. Durham, 95 Wash. App. 876, 881, 978 P.2d 514 (1999)). It follows the fresh pursuit doctrine must apply to tribes because the doctrine is a necessary means of actualizing the tribe's inherent power to enforce its internal laws. The "power to regulate is only meaningful when combined with the power to enforce." Settler v. Lameer, 507 F.2d 231, 238 (9th Cir. 1974); accord Schmuck, 121 Wash.2d at 382, 850 P.2d 1332 (holding "[f]undamental to enforcing any traffic code is the authority by tribal officers to stop vehicles violating that code. ...").[10]
*388 ¶ 16 In Schmuck we looked to Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) to determine whether a tribe had inherent sovereign power over non-Indians. 121 Wash.2d at 391, 850 P.2d 1332. Montana held the Crow Tribe could not prohibit fishing and hunting by non-Indians because those activities did not "so threaten the Tribe's political or economic security as to justify tribal regulation"; the non-Indians owned the land in fee and were fishing from land owned by the State. Montana, 450 U.S. at 566-67, 101 S.Ct. 1245. The Court asserted as a general proposition the "inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe" but also announced two exceptions to this proposition:
A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.
Id. at 565-66, 101 S.Ct. 1245 (citations omitted). Strate, 520 U.S. at 456, 117 S.Ct. 1404, held this test also applies to a tribe's inherent authority over nonmembers' conduct on state highways on the reservation.
¶ 17 Applying Montana to this case, we conclude pursuing those who break traffic laws on the reservation bears a "clear relationship to tribal self-government or internal relations" and is therefore part of the Lummi Nation's inherent sovereign authority. Montana, 450 U.S. at 564-65, 101 S.Ct. 1245. This inherent power to pursue lawbreakers does not reach "`beyond what is necessary to protect tribal self-government or to control internal relations.'" Strate, 520 U.S. at 459, 117 S.Ct. 1404 (quoting Montana, 450 U.S. at 564, 101 S.Ct. 1245). To the contrary, the right to pursue and detain those who break civil and criminal traffic laws on the reservation "is needed to preserve `the right of reservation Indians to make their own laws and be ruled by them.'" Id. (emphasis added) (quoting Williams v. Lee, 358 U.S. 217, 220, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959)). "The alternative would put tribal officers in the impossible position of being unable to stop any driver for fear they would make an unlawful stop of a non-Indian. Such a result would seriously undercut the Tribe's ability to enforce tribal law and would render the traffic code virtually meaningless." Schmuck, 121 Wash.2d at 383, 850 P.2d 1332. Such a situation clearly fits within the second exception in Montana because it would threaten the health and welfare of the tribe:
Allowing a known drunk driver to get back in his or her car, careen off down the road, and possibly kill or injure Indians or non-Indians would certainly be detrimental to the health or welfare of the Tribe.[[11]]
Id. at 391, 850 P.2d 1332. Here, Officer McSwain suspected Eriksen was driving under the influence after she drifted across the center line and came within two feet of his patrol car. McSwain testified that he ascertained Eriksen was a non-Indian only after he stopped her because he had no way of learning such information without stopping her. In Schmuck we discuss the absurd result of holding tribal officers need to release all non-Indian offenders:
"To hold that an Indian police officer may stop offenders but upon determining they are non-Indians must let them go, would be to subvert a substantial function of Indian police authorities and produce a ludicrous *389 state of affairs which would permit non-Indians to act unlawfully, with impunity, on Indian lands."
Id. at 392, 850 P.2d 1332 (quoting State v. Ryder, 98 N.M. 453, 456, 649 P.2d 756, aff'd, 98 N.M. 316, 648 P.2d 774 (1982)). Indeed, if we were to hold Officer McSwain and other officers cannot detain non-Indians who elude their authority by crossing reservation boundaries, we would enable similarly absurd results. Although Schmuck involved a DUI detention within the reservation, the court contemplated the possibility of drivers simply "refus[ing] to stop if pulled over by a tribal officer," when it rejected equating the tribal officer's authority to that of a citizen's arrest.[12]Id. at 392, 850 P.2d 1332.
¶ 18 The superior court correctly extended Schmuck to the facts at hand; if non-Indians could elude tribal officers' inherent authority to stop and detain simply by beating them across reservation boundaries, it would effectively gut this court's holding. To determine whether tribes retain their sovereign powers, we must "look[] to the character of the power that the tribe seeks to exercise, not merely the location of events." John v. Baker, 982 P.2d 738, 752 (Alaska 1999).

II. Police Have Well-Established Authority To Continue "Fresh Pursuit" onto Reservations and across Jurisdictional Boundaries
¶ 19 Division Three of the Court of Appeals, the Lummi Nation, and the Ninth Circuit have all allowed nontribal law enforcement to cross jurisdictional boundaries into Indian reservations when in "fresh pursuit" of suspects. Waters held Omak Police Department officers had authority under the fresh pursuit doctrine to arrest an enrolled member of the Colville Confederated Tribes on the Colville Reservation. 93 Wash.App. at 977-78, 971 P.2d 538. The officers had seen Thomas Waters's car peel away from a stoplight and cross the center line toward police. Id. at 973, 971 P.2d 538. When the officers activated their vehicle's emergency lights, Waters led them on a high-speed chase and finally stopped on tribal reservation property, where they arrested him for felony eluding, DWI, resisting arrest, and driving with a suspended license.[13]Id. Division Three rejected Waters's argument that the officers lacked jurisdiction to stop him: "Everybody, with or without probable cause for arrest, is required to stop for the police. RCW 46.61.024. Once the police car displayed its flashing lights, Mr. Waters was required to stop, even in the absence of an infraction." Id. at 978, 971 P.2d 538.
¶ 20 Under the doctrine of "hot pursuit," the Ninth Circuit upheld the jurisdiction of a sheriff's deputy who followed a tribal member who had been "tailgating" the deputy's marked patrol car on a state highway in Indian country. United States v. Patch, 114 F.3d 131, 132-34 (9th Cir.), cert. denied, 522 U.S. 983, 118 S.Ct. 445, 139 L.Ed.2d 381 (1997). Taylor Patch, a member of the Colorado River Indian Tribe, argued the deputy was trespassing when he followed him to his home in Indian country. The court held the deputy had observed Patch's reckless driving and had authority to conduct a Terry[14] stop to determine if Patch was a tribal member and whether the deputy had jurisdiction to issue a citation. Id. at 134 (citing Schmuck, 121 Wash.2d at 382-83, 850 P.2d 1332 for the proposition that a tribal officer may stop a speeding vehicle if the driver is a tribal member).
¶ 21 The Lummi Tribal Court also recognized the authority of a Whatcom County sheriff's deputy to come onto the reservation in pursuit of a tribal member who allegedly stole from a convenience store outside the reservation. Lummi Nation v. Scarborough, No. 2008-CRCO-2084, slip op. at 1-4 (Jan. 5, *390 2009).[15] The tribal member filed a motion to dismiss, arguing the deputy did not have jurisdiction to investigate criminal activity on tribal land and the officer was not covered under the Lummi Code of Laws 5.07.055, which deals with obstructing a public servant as a "Law Enforcement Officer." Id. at 2. The court denied the motion, reasoning the deputy was "attempting to investigate a crime that had taken place off the reservation by unknown individuals. He had no way of knowing whether those individuals were Lummi, non-Native Lummi, or non-Native." Id. at 3. Moreover, the court noted "[t]here are many situations that can arise that would result in an officer from a jurisdiction other than Lummi being on the reservation. It stands to reason that those officers should not be obstructed in carrying out their responsibilities any more than a Lummi officer." Id. at 3-4.
¶ 22 The doctrine of fresh pursuit has also arisen in cross-jurisdictional cases across national borders.[16] None of the settled law in these areas may be wholly applicable to tribes, however, which are sovereign entities, sometimes subject to jurisdiction of the state but also not subject to federalism.
¶ 23 In sum, the doctrine of "fresh pursuit" authorizes nontribal police to cross jurisdictional boundaries into Indian country; the same policy justifying this practice applies to tribal police departments as well.

III. Washington Mutual Aid Peace Officers Powers Act Authorizes Tribal Police Departments To Continue "Fresh Pursuit" across Jurisdictional Boundaries
¶ 24 In addition to the Lummi Nation's inherent authority to enforce its laws, which necessitates authority to continue the "fresh pursuit" of suspects, Washington state law also grants tribal police departments the power to continue pursuing beyond their jurisdiction "[i]n response to an emergency involving an immediate threat to human life or property" or when in "fresh pursuit." RCW 10.93.070(2), (6). As aforementioned fresh pursuit is a common law and statutory exception to territorial jurisdiction allowing law enforcement to pursue suspects across jurisdictional boundaries.
¶ 25 Until the legislature passed the Washington Mutual Aid Peace Officers Powers Act of 1985, chapter 10.93 RCW, peace officers had no authority to arrest offenders outside their municipality's geographic boundary. See, e.g., City of Wenatchee v. Durham, 43 Wash.App. 547, 549, 718 P.2d 819 (1986). A Seattle peace officer, for example, could not have made an arrest in Tacoma. Chapter 10.93 RCW modified these "artificial barriers to mutual aid and cooperative enforcement of the laws ..." RCW 10.93.001(2), by empowering "general authority Washington peace officer[s]" to exercise authority outside their jurisdictions "[i]n response to an emergency involving an immediate threat to human life or property" or "when ... in fresh pursuit, as defined in RCW 10.93.120." RCW 10.93.070(2), (6).
¶ 26 Eriksen argues RCW 10.93.120 prevents tribal officers from engaging in a "fresh pursuit" off the reservation for traffic infractions or crimes committed on the reservation. Pet. for Review at 4. She points to RCW 10.93.120(1) to argue the doctrine applies only to peace officers with authority to make an arrest and here the tribal officer was clear he had no authority to arrest because Eriksen was non-Indian. This argument *391 is not well-founded because RCW 10.93.120(1) must not be read in isolation from the rest of the Washington Mutual Aid Peace Officers Powers Act of 1985  especially the legislature's statement of intent and construction in RCW 10.93.001. Indeed, RCW 10.93.120(1) refers to "[a]ny peace officer who has authority under Washington law to make an arrest ...." (Emphasis added.) But this subsection governs "fresh pursuit" arrests. It does not follow that RCW 10.93.120(1)  which outlines when an arresting officer may proceed in fresh pursuit  precludes officers from completing stops initiated on the reservation. Moreover, it is RCW 10.93.120(2), that contains the actual definition of "fresh pursuit" to which the operative section, RCW 10.93.070(6), refers.
¶ 27 This definition of "fresh pursuit"  in RCW 10.93.120(2)  broadens the common-law doctrine, which previously applied only to felonies, to include all traffic or criminal law violations: "The term `fresh pursuit,' as used in this chapter, includes, without limitation, fresh pursuit as defined by the common law." (Emphasis added.) The common law definition employed five criteria for analysis of fresh pursuit, none of which included authority to arrest.[17]
¶ 28 Most importantly, RCW 10.93.120(1) is part of the Washington Mutual Aid Peace Officers Powers Act of 1985; it therefore must be "liberally construed to effectuate the intent of the legislature to modify current restrictions upon the limited territorial and enforcement authority of general authority peace officers and to effectuate mutual aid among agencies." RCW 10.93.001(3) (emphasis added). The act was passed to allow courts to consider "`the Legislature's overall intent to use practical considerations in deciding whether a particular arrest across jurisdictional lines was reasonable.'" Vance, 116 Wash.App. at 416, 65 P.3d 668 (emphasis added) (quoting Durham, 95 Wash.App. at 881, 978 P.2d 514).
¶ 29 RCW 10.93.070(6) is the section of the act which authorizes all "general authority Washington peace officer[s] [to] enforce the traffic or criminal law[] ... [w]hen the officer is in fresh pursuit, as defined in RCW 10.93.120" (emphasis added). The issue is whether the LNPD falls within the definition of "general authority Washington law enforcement agency" in RCW 10.93.020, not whether its officers have power to arrest.[18] "General authority Washington peace officer" means "any ... officer of a general authority Washington law enforcement agency who is commissioned to enforce the criminal laws of the state of Washington generally." RCW 10.93.020(3) (emphasis added). "General authority Washington law enforcement agency" means:
any agency, department, or division of a municipal corporation, [or] political subdivision, or other unit of local government of this state, and any agency, department, or division of state government, having as its primary function the detection and apprehension of persons committing infractions or violating the traffic or criminal laws in general. ...
RCW 10.93.020(1) (emphasis added). While this statute is not unambiguous, the Lummi Nation  like all federally recognized tribes  is unquestionably a political entity. Chief Justice Marshall classified Indian tribes as "domestic dependent nations" whose "relation to the United States resembles that of a ward to his guardian," Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831), and the Supreme Court has consistently recognized Indian tribes as "political communities." See McClanahan v. Ariz. *392 State Tax Comm'n, 411 U.S. 164, 168, 174, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973) (citing Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 559, 8 L.Ed. 483 (1832)). But see Yukon-Kuskokwim Health Corp. v. Nat'l Labor Relations Bd., 344 U.S.App. D.C. 133, 234 F.3d 714 (2000) (holding the National Labor Relations Board did not act arbitrarily in determining exemption from coverage for states or political subdivisions did not apply to tribes with respect to activities conducted off-reservations). Moreover, the LNPD's primary function is to detect and apprehend Indians who violate the law on the reservation and to detect and apprehend non-Indians who violate the law on the reservation and then turn them over to local authorities. CONSTITUTION AND BYLAWS OF THE LUMMI TRIBE OF THE LUMMI RESERVATION, art. VI, § 1; TREATY OF POINT ELLIOTT art. 9, 12 Stat. 927 ("[T]he said tribes agree not to shelter or conceal offenders ... but to deliver them up to the authorities for trial." (emphasis added)).
¶ 30 Any interpretation of the Washington Mutual Aid Peace Officers Powers Act of 1985 that would limit the Lummi Nation's tribal sovereignty must be construed strictly:
When we are faced with these two possible constructions [of a statute], our choice between them must be dictated by a principle deeply rooted in this Court's Indian jurisprudence: "[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."
County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation, 502 U.S. 251, 269, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992) (second alteration in original) (quoting Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985)). Under such a construction  which resolves ambiguities in RCW 10.93.020(1), (3) in favor of the Lummi Nation  the LNPD is a "general authority Washington law enforcement agency" and therefore its officers may engage in "fresh pursuit" as defined in RCW 10.93.120(2). McClanahan, 411 U.S. at 174, 93 S.Ct. 1257 ("`[d]oubtful expressions are to be resolved in favor [of the Indian tribe]'") (quoting Carpenter v. Shaw, 280 U.S. 363, 367, 50 S.Ct. 121, 74 L.Ed. 478 (1930)); Blackfeet Tribe, 471 U.S. at 766, 105 S.Ct. 2399 ("[T]he standard principles of statutory construction do not have their usual force in cases involving Indian law.").
¶ 31 The LNPD is the primary responder to all dispatch calls within the Lummi Reservation, regardless of Indian status. Br. of Amicus Curiae Lummi Nation, App. I (Aff. of Chief Gary James) at A-3.[19] The reservation is located on a peninsula and has many non-Indian residences. Id. It also contains the only public access to Lummi Island, an island beyond the reservation and home to many non-Indians. Id. Lummi Nation police officers therefore generally enforce Washington criminal law within the meaning of RCW 10.93.020(3) whenever they arrest lawbreakers on their reservation who are Indian, or stop and detain lawbreakers who are non-Indian and then transfer them to local authorities for prosecution.[20]
¶ 32 In sum, LNPD officers may exercise authority outside their jurisdictions when continuing in "fresh pursuit" of a suspect because these officers are general authority Washington peace officers within the meaning of the Washington Mutual Aid Peace Officers Powers Act of 1985. RCW 10.93.070, .001; accord 12 ROYCE A. FERGUSON, JR., WASHINGTON PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 3108, at 49 n. 2 (3d ed. Supp.2008-09) (referring to "tribal police officer[s]" as "general authority Washington peace officer[s] with authority to enforce *393 the criminal and traffic laws of the state").

CONCLUSION
¶ 33 The Lummi Nation Police Department has authority under the Lummi Nation's sovereign authority and under the Washington Mutual Aid Peace Officers Powers Act of 1985, chapter 10.93 RCW, to enforce its laws by continuing the "fresh pursuit" of suspects off the reservation and then detaining these suspects until authorities with jurisdiction arrive.
¶ 34 We affirm the trial court.
WE CONCUR: ALEXANDER, C.J., C. JOHNSON, MADSEN, CHAMBERS, OWENS, FAIRHURST, J. JOHNSON, and STEPHENS, JJ.
NOTES
[1] Driving under the influence.
[2] Under Lummi Nation Code of Laws 6.04.050(a), all drivers must use low beams within 500 feet of oncoming cars. Accord RCW 46.37.220, .230.
[3] LNPD officers complete either the Washington State Police Academy or the Federal Law Enforcement Training Academy and the Basic Law Enforcement Equivalency Academy provided by the Washington State Criminal Justice Training Commission. Br. of Amicus Curiae Lummi Nation, App. I (Aff. of Chief Gary James) at A-2. The commission, established in 1974, provides law enforcement training for all criminal justice personnel in Washington. See RCW 43.101.200; 1978 Letter Op. Att'y Gen. No. 18, at 5 (affirming commission authorized to train tribal police). All law enforcement officers must also obtain certification as peace officers from the commission, but until 2006 tribal law enforcement could not obtain this certification. See RCW 43.101.095, .157 (authorizing tribal governments to obtain certification by entering into written agreements with the commission).
[4] See also generally U.S. Dep't of Justice, "Jurisdictional Summary," U.S. Attorneys' Manual, Title 9, Criminal Resource Manual 689, http:// www.usdoj.gov/us ao/eousa/foia_reading_room/usam/title9/crm00689.htm (last visited Sept. 10, 2009).
[5] The trial court noted, "[T]here has been for many years a dispute between the County and the Tribe as to the boundaries of the Reservation...." CP at 86 (Tr. (Jan. 26, 2006) at 71). The Lummi Nation considers both lanes of Slater Road to be within the reservation, while the County apparently claims the boundary runs down the middle of the road. Eriksen did not assign error to findings that the incident began on the reservation. This court considers unchallenged findings of fact verities on appeal. State v. Hill, 123 Wash.2d 641, 647, 870 P.2d 313 (1994). Therefore we assume "the incident occurred or some portion of the incident occurred within the boundaries of the reservation"; the issue is whether the tribal officer had authority to pursue and detain off the reservation when the violation occurred on the reservation. VRP (Aug. 22, 2007) at 38-39.
[6] The State does not argue even if the pursuit and detention were unlawful, the illegal arrest would not prevent subsequent prosecution. Cf. State v. Barker, 143 Wash.2d 915, 922 n. 4, 25 P.3d 423 (2001) (suppressing evidence obtained unlawfully in fresh pursuit across state borders yet leaving undecided whether the exclusionary rule applies to Washington's fresh pursuit statute). Accordingly we decide the case only on the basis of the issue set forth by the parties in their briefs. RAP 12.1(a).
[7] See generally Stewart Wakeling et al., U.S. Dep't of Justice, Policing on American Indian Reservations: A Report to the National Institute of Justice (July 2001), available at http://www.ncjrs. gov/pdffiles1/nij/188095.pdf.
[8] Tribal jurisdiction also occasionally extends beyond Indian country in other contexts. In John v. Baker, the Alaska Supreme Court upheld a tribal court's authority to adjudicate a child custody dispute  arising outside of Indian country  between members of two separate tribes: "[I]n determining whether tribes retain their sovereign powers, the United States Supreme Court looks to the character of the power that the tribe seeks to exercise, not merely the location of events." 982 P.2d 738, 752 (Alaska 1999). In Settler v. Lameer, 507 F.2d 231, 239-40 (9th Cir. 1974), the Ninth Circuit Court of Appeals recognized the power of tribes in Washington to regulate their off-reservation hunting and fishing rights reserved by treaty.
[9] The United State Senate ratified more than 400 treaties with Indian nations until 1871 when the Congress prohibited further treaty-making. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 4.05[1] at 276. These treaties are both a source of federal law and tribal law in areas such as tribal boundaries and use of natural resources. See, e.g., Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999) (upholding treaty right to off-reservation hunting and fishing).
[10] Similarly, District of Columbia courts have held United States Capitol Police have authority to continue pursuits beginning on the Capitol grounds and then crossing the boundary. In re C.A.P., 633 A.2d 787 (D.C.1993) (officers who initiate stops on Capitol grounds may continue to pursue the motorists under doctrine of fresh pursuit); Andersen v. United States, 132 A.2d 155(D.C), aff'd, 102 U.S.App. D.C. 313, 253 F.2d 335 (1957), cert. denied, 357 U.S. 930, 78 S.Ct. 1375, 2 L.Ed.2d 1372 (1958) (authorizing Capitol Police to arrest outside of their jurisdiction if circumstances leading to arrest were immediately connected to their duties within the boundaries).
[11] According to the Lummi Tribal Vital Statistics Office, the LNPD issued 252 citations for DWI from 2003-2005, and there were 28 motor vehicle accidents involving injuries and 3 involving fatalities. Jennie R. Joe et al., Native Am. Research & Training Council, Final Report: Participatory Evaluation of the Lummi Nation's Community Mobilization Against Drugs Initiative/Bureau of Justice Assistance's Indian Alcohol and Substance Abuse Demonstration Project 48 (Mar.2008) (unpublished report, on file with the U.S. Dep't of Justice), available at http://www. ncjrs.gov/pdffiles1 /nij/grants/222741.pdf.
[12] The Whatcom County Prosecutor asks us in the alternative to uphold Eriksen's arrest on a citizen's arrest theory. We need not reach this issue because we hold the LNPD had authority to pursue Eriksen across the reservation boundary and stop and detain her until authorities with jurisdiction arrived.
[13] Although two of the officers were commissioned tribal officers, the Court of Appeals considered the "fresh pursuit" an independent and sufficient basis for their authority to arrest on the reservation. Waters, 93 Wash.App. at 973, 978, 971 P.2d 538.
[14] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[15] See Br. of Amicus Curiae Lummi Nation, App. II at A-5.
[16] "Hot pursuit" of unauthorized oceangoing vessels across national borders is an ancient doctrine of the law of nations. See Glanville L. Williams, The Juridical Basis of Hot Pursuit, 20 Brit. Y.B. Int'l L. 83, 84 (1939). Although no customary right of hot pursuit across national land borders evolved as it did for territorial waters, the United States Supreme Court has acknowledged international hot pursuit across land borders did occur. See In re Kaine, 55 U.S. (14 How.) 103, 113, 14 L.Ed. 345 (1852) (noting the necessity of hot pursuit across the border between United States and British possessions in America based on treaty of 1842). Notwithstanding those realities on the ground, the doctrine of hot pursuit across national land borders never became a customary right of international law. See RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 432(2) (1987) (nation's law enforcement officers may exercise their functions in the territory of another nation only with the consent of the other state).
[17] The requirements included: (1) a felony occurred within the jurisdiction; (2) the individual sought knew he is being pursued; (3) the police pursued without unnecessary delay; (4) the pursuit was continuous and uninterrupted; and (5) there was a relationship in time between the commission of the offense, commencement of the pursuit, and apprehension of the suspect. City of Wenatchee v. Durham, 43 Wash.App. at 550-51, 718 P.2d 819 (citing United States v. Santana, 427 U.S. 38, 43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976)). Authority to arrest was not an enumerated requirement at common law.
[18] Cf. State v. Malone, 106 Wash.2d 607, 610 n. 1, 612, 724 P.2d 364 (1986) (holding an Idaho police officer had authority to pursue a suspect into Washington under common law "fresh pursuit" doctrine  even though the officer had no authority to arrest under Idaho law  because eluding an officer was a felony under Washington law).
[19] The State lacks jurisdiction over Indians who breaks laws on reservations, except for eight exceptions under RCW 37.12.010 in which the State has concurrent jurisdiction. State v. Cooper, 130 Wash.2d 770, 774, 928 P.2d 406 (1996); State v. Pink, 144 Wash.App. 945, 952, 185 P.3d 634 (2008). The Lummi Nation therefore enforces criminal law in the majority of cases arising from the tribe itself.
[20] Effective July 1, 2008, tribal officers have been able to expand this law enforcement power to also include the power to make arrests on the reservation by taking a series of steps including completing requirements in RCW 43.101.157 and executing an interlocal agreement pursuant to chapter 39.34 RCW. RCW 10.92.020.